(2008)
SIERRA CLUB, The Chattooga Conservancy, Biodiversity Legal Foundation, Florida Biodiversity Project, Forest Conservation Council, Georgia Forest Watch, Ouachita Watch League, Southern Appalachian Biodiversity Project, Wild Alabama, Wild South, Wilderness Society, and Jerry Williams, Plaintiffs
v.
UNITED STATES FOREST SERVICE; Charles L. Myers, in his capacity as Regional Forester of the Southern Region of the U.S. Forest Service; Dale Bosworth, in his official capacity as Chief of the U.S. Forest Service; and Ann Veneman, in her official capacity as Secretary of the U.S. Department of Agriculture, Defendants.
Civil Action No. 1:03-cv-1230-ODE.
United States District Court, N.D. Georgia, Atlanta Division.
November 24, 2008.

ORDER
ORINDA D. EVANS, District Judge.
This civil suit is before the Court for determination of remedies for the Defendants' failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, ("NEPA") when preparing (1) Supplemental Environment Impact Statements ("SEISs") which supplemented certain Vegetation Management Environmental Impact Statements ("VMEISs") and (2) 2002 forest plan amendments for forest plans in Region Eight of the U.S. Forest Service. The environmental analysis in the SEISs also served as the environmental analysis for the 2002 forest plan amendments. No separate NEPA analysis was done for the forest plan amendments. A single Record of Decision ("ROD") approved and adopted each of the three subregional SEISs and the respective subregional 2002 forest plan amendments. Therefore, the deficient environmental analysis in each SEIS required that the ROD be vacated and that the 2002 forest plan amendments be set aside. These determinations were made in an Order entered February 22, 2008, which granted in part and denied in part Plaintiffs' remaining[1] claims. 535 F.Supp.2d 1268 (N.D.Ga.2008). Specifically, the Court granted Plaintiffs' motion for summary judgment as to Claim II, and denied Defendants' cross motion; the Court granted Defendants' motion for summary judgment as to Claims I and III and denied Plaintiffs' corresponding cross motion. Therefore, the remedies addressed herein pertain only to Claim II.
Claim II involves one part of Vegetation Management Environmental Impact Statements ("VMEISs") which had been formulated in 1989-1990 in each of the three subregions of Region Eight.[2] These VMEISs were designed to study the environmental effects which could flow from the use of certain "vegetation management methods" and to recommend options for using (or not using) the various methods given the advantages or disadvantages of each method.[3] The subject "vegetation management methods" were prescribed fire, mechanical methods, manual methods, herbicides, and biological methods. Each VMEIS recommended (as a "preferred alternative") a certain combination of methods for its subregion. Each contained a large number of "mitigation measures" which would mitigate adverse environmental effects from the use of each of the five methods. One mitigation method common to all three VMEISs and all five vegetation management methods was mitigation measure (2), which was the subject of the Court's February 22, 2008 Order and indeed the central focus of this litigation. This mitigation measure concerned the requirement of a biological evaluation to determine whether a proposed project which used one or more vegetation management methods would affect PETS species known to exist or possibly existing in and around the proposed project area. No project could proceed without such a biological evaluation. Mitigation measure (2) dealt with how to determine which PETS had to be the subject of a particular biological evaluation. This was needed because designations of proposed endangered and threatened species are nationwide. 16 U.S.C. § 1538; 50 C.F.R. §§ 17.21; 17.31. Sensitive species designations are regionwide for the various regions of the U.S. Forest Service. However, all PETS (including sensitive species) are subject to geographic/locational limitations based on their range and their unique habitat requirements.
The relationship between Region Eight's VMEISs/SEISs on the one hand and the forest plans/forest plan amendments on the other hand is complex. Under the National Forest Management Act ("NFMA"), a project must be consistent with the relevant forest plan. 16 U.S.C. § 1604(i). The VMEISs are separate documents from the forest plans. They are not environmental impact statements for forest plans, which have their own environmental impact statements. They do not describe or authorize individual forest projects.[4] Rather, the VMEISs are programatic environmental impact statements. Unlike an environmental impact statement for a particular, already defined project, the VMEISs studied the environmental effects which could arise in future, as yet undefined forest projects and established a framework for dealing with those environmental issues. The 1989-1990 ROD for each VMEIS approved and adopted the preferred alternative for vegetation management and also adopted most of the mitigation methods identified in the VMEIS including the original version of mitigation measure (2).[5] In essence, the RODS for the VMEISs approved the use of certain vegetation management methods for future projects conditioned upon compliance with the mitigation measures.[6] The decisions made in the RODs for the VMEISs (including the decision to adopt the original version of mitigation measure (2)) were incorporated into all forest plans in Region Eight in 1989-1990. This was done by amendments to the individual forest plans. Most of the 1989-90 forest plan amendments were physically attached to the RODs for the VMEISs.
In 2000 a second version of mitigation measure (2) was substituted in three Region Eight forest plans by amending those plans. These amendments were for the Chattahoochee-Oconee Forest Plan, the Forest Plan for National Forests in Alabama, and the Ozark-St. Francis/Ouachita Forest Plan. The environmental analysis was contained in environmental assessments. There was no corresponding revision of the VMEISs in 2000. The VMEISs were never amended to substitute the second version of mitigation measure (2). The 2002 forest plan amendments were impressed upon whatever forest plan versions existed throughout Region Eight in 2002, incorporating the 2002 SEISs' version of mitigation measure (2) into all plans. This was the third version of mitigation measure (2).
All forest plans must be revised[7] at least every fifteen years. 16 U.S.C. § 1604(f)(5). Until 2005, the applicable regulations required each revision to be accompanied by an environmental impact statement, as opposed to the more modest environmental assessment which may in some cases accompany a forest plan amendment.[8] The forest plans in Region Eight do not all come up for revision at the same time. There is no discernible pattern. A few plans have not been revised since before the 1989-1990 VMEISs were created,[9] although through the plan amendments made in 1989-90 they contain the original version of mitigation measure (2). Some plans were revised during the early to mid 1990's. They may also contain the original version of mitigation measure (2).[10] Two plans (Florida and Kisatchie) were revised in 1999. They contain a version of mitigation measure (2) which is similar to but not identical to the second version (the 2000 version). See Revised Land and Resource Management Plan, Kisatchie National Forest [AR 712 at 2-8, FW 009]. The ROD for the revised Kisatchie plan acknowledges the 1989 Coastal Plain/Piedmont VMEIS but notes the decision to alter the 1989 VMEIS's version of the mitigation measure (2) language in the revised plan. [AR 713 at R-5 and R-6]. The ROD for the revised Florida plan notes that it is modifying portions of the RODs for various regional documents, including the ROD for the 1989 Coastal Plain/Piedmont VMEIS which adopted the original version of mitigation measure (2). See Revised Land and Resource Management Plan for National Forests in Florida [AR 611 at 3-26]. The remaining Region Eight forest plans apparently were totally revised after 2002. All of the forest plans which contained the 2000 version of mitigation measure (2) have been superceded by new, revised plans. It is unclear whether the post-2002 revised plans contain any version of mitigation measure (2). Most of the post-2002 revised plans are not in the record. At least one of the post-2002 revised plan RODs acknowledges the 1989-1990 VMEIS and the 2002 SEIS as documents which were considered in preparing the revised plan. However, it does not state that they are authoritative or controlling. See, e.g., ROD for 2005 Revised Land and Resource Management Plan, Ouachita National Forest [AR 910 at 13].
The original version of mitigation measure (2) was the subject of Sierra Club v. Martin, 168 F.3d 1 (11th Cir.1999). That case involved a claim that two projects in the Chattahoochee-Oconee National Forests did not comply with the forest plan, which had incorporated the original version of mitigation measure (2) from the subregional VMEIS's ROD. The argument was that the projects were inconsistent with the forest plan and thus violated the NFMA, 16 U.S.C. § 1604(i), which requires that projects in a national forest be consistent with the requirements of the forest plan. The forest plan per the language of mitigation measure (2) said that the biological evaluation should consider "all available inventories [of PETS] and their habitat for the proposed treatment area"; "when adequate population inventory information [for PETS within the project site] is unavailable, it must be collected when the site has high potential for occupancy [by PETS]." The Forest Service admitted that it had obtained no forestwide or project-specific "inventories" of PETS. The Court of Appeals found an NFMA violation and held that the projects could not proceed. In so doing the Court of Appeals observed that the record failed to show that the Forest Service possessed forest-wide inventories for PETS which occurred in the project areas; therefore, it was not possible to measure the extent to which the destruction of PETS in the project area might impact the overall forest population. This Court interprets this part of Martin as dicta. Plaintiffs read the Martin decision as holding that: mitigation measure (2) requires that the Forest Service monitor trends for PETS on a forest-wide basis; to carry out this obligation, the Forest Service must maintain a numerical count of each PETS species residing in each national forest and must obtain a numerical count of each PETS species in a proposed project area. Absent the confirmed existence of these "inventories", no project can proceed, regardless of whether the project methods would harm any PETS. Plaintiffs regard the showing of forest-wide and project-specific "inventories" as a condition precedent to the approval of any projects.[11]
In granting Plaintiffs' motion for summary judgment on Claim II, this Court vacated the 2002 RODs for the three 2002 SEISs and set aside the 2002 forest plan amendments which depended on the same RODs.[12] The question now before the Court is what further remedies to impose.
The remedies Plaintiffs seek are the following: (1) an injunction against the authorization[13] of future projects under the 2002 amendments pending NEPA compliance for those amendments; (2) an injunction as to some but not all Forest Service projects which were authorized pursuant to the 2002 forest plan amendments prior to February 22, 2008, pending NEPA compliance for the 2002 amendments; (3) an injunction against relying on the 2002 SEISs, (4) a declaration that projects described in (1) and (2) must be carried out in compliance with the original version of mitigation measure (2) as set forth in the 1989-1990 VMEISs, unless there is a supplement to the VMEISs which complies with NEPA; and (5) a declaration that the 1989-1990 VMEISs govern all future Region Eight vegetation management projects, regardless of whether those projects are authorized under a 2002 amendment or otherwise, until the VMEISs are supplemented or replaced by documents which comply with NEPA.

INJUNCTIVE RELIEF AGAINST IDIVIDUAL PROJECTS
Defendants contend that no injunctive relief as to projects authorized under the 2002 amendments should be granted. They make three arguments. The first is that the NEPA violation found on Claim II was technical in nature and constituted harmless error, such that no injunctive relief should be granted. Defendants point out that in NEPA cases the harmless error rule does apply, as recognized in Nevada v. Dept. of Energy, 457 F.3d 78, 89-91 (D.C.Cir.2006). The second argument is that to the extent that the remaining projects are purely commercial timber sales or road construction activities, the projects are not subject to the constraint of the 1989-1990 VMEISs, allegedly because the VMEISs were limited to certain activities which did not include commercial timber sales or road construction activities. Specifically, the three VMEISs excluded "... harvest cutting methods" and "road construction". [AR 104 at 1-2; AR 204 at 1-2; AR 304 at I-2]. Defendants also point out that the SEISs stated that the vegetation management activities which were covered by the 1989-1990 VMEISs "do not include commercial timber harvesting". [AR 114 at 1; AR 214 at 1; AR 314 at 1]. The third argument is that region-wide injunctive relief against projects is beyond the scope of the pleadings.
The Court first addresses Defendants' argument that their failure to acknowledge the 2002 forest plan amendments/SEISs and the 2002 Region Eight Supplement to the Forest Service Manual (which included the 2002 decision tree) as connected actions was harmless error. Among the thirty seven letters the Forest Service received when it sent out the draft SEISs in early 2002 were numerous negative comments concerning the proposed Region Eight Supplement to the Manual. The Forest Service responded in part to seven of the commenters that the proposed Supplement was "outside the scope of the proposal". This was consistent with the Forest Service's position in this litigation that changes in the Forest Service Manual are administrative in nature and thus are entitled to a categorical exclusion from NEPA compliance.[14] The Forest Service's presumed failure to consider the referenced comments is somewhat mitigated by the fact that when the Forest Service originally sent out its Notice of Intent in 2001 (the "scoping notice") it addressed both the proposed change to mitigation measure (2) in the VMEISs and the proposed Supplement to the Manual. Drafts of both the proposed SEISs and the proposed Region Eight Supplement were included with the Notice of Intent and comments on both were solicited. Over 150 written responses were received. [AR 114 at 3; AR 214 at 3; AR 314 at 3]. Many of the responses did address the proposed Supplement to the Manual as well as the proposed change in mitigation measure (2). Also, the Forest Service sent both the proposed Supplement to the Manual and the proposed SEISs to the Fish and Wildlife Service for review of these documents' potential effect on threatened and endangered species. The Fish and Wildlife Service gave written concurrence to the proposal. [AR 313 at App. 3]. Because the Interior Department, of which the Fish and Wildlife Service is a part, has the statutory responsibility to designate and monitor threatened and endangered species, 15 U.S.C. § 1533, this concurrence is entitled to considerable weight. Finally, the SEISs themselves showed how the new version of mitigation measure (2) would work in combination with the 2002 decision tree which was contained in the Supplement to the Manual. [AR 113 at 3, 8, 37; AR 213 at 3, 7, 31; AR 313 at 3, 8, 19]. Therefore, it is obvious that the Forest Service did consider the relationship between the two. Nonetheless, the violation is not harmless, because the Region Eight Supplement became part of the Forest Service Manual based in part on a faulty assumption that a categorical exclusion exempted it from NEPA review. The Region Eight Supplement was a "connected action" to the 2002 amendments and the 2002 SEISs. As stated in the February 22, 2008 order, the 2002 amendment language makes no sense unless it is read in conjunction with the decision tree in the Region Eight Supplement. In addition, and more importantly, the Supplement applies to all biological evaluations in Region Eight, not just those carried out under the 2002 amendments.
The Court rejects Defendants' argument that commercial timber harvests and road construction are activities which are outside the scope of the 1989-1990 VMEISs. The 1990 VMEIS for the Ozark/Ouachita Mountains, Volume 1, I-1 through 1-2 enumerates the five vegetation management methods which are the subject of the VMEIS and also the activities addressed by the VMEIS. The "activities" addressed by the VMEIS are listed at I-1 and 1-2 as follows:
The vegetation management program covered by this EIS contains six activities. These activities are:
 Site preparation for reforestation of pines and hardwoods; which is done to reduce plant competition so that pine and hardwood seedlings and saplings get needed amounts of sunlight, water, nutrients, and growing space in order to survive and grow in newly established stands.
 Stand management for timber stand improvement (release, precommercial thinning); which maintains balanced species composition and vigorous growth conditions for trees by controlling plant competition.
 Wildlife habitat improvement, including openings maintenance; which provides a wide variety of plants and habitat conditions beneficial to wildlife, and also protects and enhances habitats of threatened, endangered, proposed, and sensitive plant and animal species.
 Corridor maintenance for roads and trails, utilities, and railroads; which provides safe travelways and protects investments.
 Range forage improvement; which maintains plant species used by livestock.
 Fuels treatment; which is done to reduce hazardous fuels and risks of wildfire damage.
Activities affecting vegetation not addressed include silvicultural systems, harvest cutting methods, road construction, recreation and administrative site maintenance, and management of nurseries, seed orchards, and aquatic vegetation.
The five "vegetation management methods" evaluated by the VMEIS are listed at 1-2 as follows:
 Herbicides, which can be applied as granules or liquid droplets by hand, machine, or helicopter.
 Mechanical, the use of machines such as mowers or tractors and bulldozers with attachments.
 Prescribed fire, which can be applied by ground and aerial ignition tools.
 Manual, the use of hand-held tools.
 Biological, the use of livestock to control vegetation by grazing.
[AR 304 at I-2]. The VMEISs and' RODs for the Appalachian subregion and the Coastal Plain/Piedmont subregion are the same in this respect. [AR 104 at 1-2, 1-3; AR 204 at I-1, I-2].[15]
Defendants further point out that the SEISs specifically stated, "The vegetation management activities covered by the VMEIS include herbicide use, prescribed fire, and mechanical site preparation but do not include commercial timber harvesting." [AR 114 at 2; AR 214 at 2; AR 314 at 2]. This statement was simply an inaccurate recitation of what the VMEISs themselves said. In the VMEISs, the five vegetation management methods were specifically defined as "methods", not "activities".
The list of covered activities neither specifically includes nor specifically excludes commercial timber harvests. The exclusion of "harvest cutting methods" does not exclude coverage for the activity of commercial timber harvest. Cutting timber does involve at least two of the vegetation management methods, manual and mechanical. More importantly, based on Defendants' description of many of the 456 projects that were authorized under the 2002 amendments it appears that commercial timber sales are normally a part of such covered activities as timber stand management, thinning projects, wildlife habitat improvement projects and fuels treatment projects. Further, the Court notes Defendants' position stated through Dr. Thomas's testimony that the Forest Service no longer conducts commercial timber sales as a stand-alone activity;[16] rather, the timber sales are part of projects designed to promote the health of the forest, protected species or public safety. Because commercial timber harvests are normally a part of covered activities, they are not exempt from the coverage of the VMEISs.
The projects in this case which involve road construction are vegetation management projects in which road construction is only one part. There are no stand-alone road construction projects. In this context, the constraints of the VMEISs do apply.

SCOPE OF INJUNCTIVE RELIEF
Defendants argue that a region-wide injunction against projects authorized under the 2002 amendments would be outside the scope of the pleadings. This argument has some merit. The original complaint in the Chattooga Conservancy case (filed July 26, 2001) was limited to claims involving the 2000 forest plan amendments for forest plans in Alabama, Arkansas and Georgia and the 1999 revised forest plans for Florida and Louisiana. The prefatory "Facts" section in the original complaint, paragraphs 11 through 29, made that clear. The original complaint contained four counts, none of which addressed the 2002 amendments or indeed the 2002 SEISs. Of course, at that time neither the 2002 amendments nor the 2002 SEISs had been created.
Plaintiffs' Supplement to Complaint filed July 9, 2003, contained two counts. Count VI, entitled "Violations of NEPA and the APA in the Supplemental Environmental Impact Statements", asserted in paragraph 2 thereof that the SEISs had "deleted the mitigation measures requiring population inventories for proposed, endangered, threatened and sensitive (PETS) species from the VMEISs and replaced them with language identical to the amendments to the Land and Resource Managements Plans (LRMPs) that had previously been made for Georgia, Alabama and Arkansas, and the revisions to the LRMPs for Louisiana and Florida; said amendments and revisions being the subject of the original complaint in the captioned matter." This assertion was factually incorrect; the version of mitigation measure (2) in the SEISs was newly created in 2002 and was reflected in the 2002 forest plan amendments. It was not the version which had previously been put into the 2000 amendments for the forest plans in Georgia, Alabama and Arkansas. Nor was it the version which was in the 1999 revised forest plans for Louisiana and Florida.
Paragraph 4 claimed that the SEISs were unlawful because of failure to comply with NEPA in various ways (one of which this Court found meritorious). The three SEISs collectively cover all of Region Eight. However, that does not necessarily mean that all national forests in Region Eight were "covered" by the allegations of Plaintiffs' Complaint. The Chattahoochee National Forest and a part of the National Forests in Alabama are in the Appalachian subregion, the Ouachita National Forest is in the Ozark/Ouachita subregion, and the Oconee National Forest, the National Forests in Florida, and the Kisatchie National Forest in Louisiana, and a part of the National Forests in Alabama are in the Coastal Plain/Piedmont subregion. Therefore, the reference to all three SEISs was required to "cover" the specific national forests referenced in the Complaint and Supplement to Complaint.
Count VII ("Implementation of the Amended Management Plans and Supplemental Environmental Impact Statements") of the Supplement to Complaint, Paragraph 7 said:
Defendants have taken action in the Forest Service's Southern Region, (Region Eight), pursuant to some or all of the amended or revised LRMPs at issue in this suit. Such actions include, but are not necessarily limited to: timber harvests and other vegetative management practices in the Ouachita National Forest, and pine beetle management in the Chattahoochee-Oconee National Forest in Georgia. (Emphasis supplied).
"The amended or revised LRMPs at issue in this suit" were the forest plans for National Forests in Georgia, Alabama and Arkansas, as amended in 2000, plus the 1999 revised forest plans for Florida and Louisiana.
In paragraphs 8 and 9 of Count VII, Plaintiffs contested the administrative appeal rulings on the Wildhorse Creek and Oliver Branch projects. Both of these projects were authorized under the 2000 amendment to the Ouachita Forest Plan.
Paragraph 12 of Count VII asserted that "because the LRMPs and/or SEISs were unlawful and invalid, the Ouachita timber harvest and other vegetative management practices should have complied with the previously existing LRMP for the forest." The referenced forest plan was the plan for the Ouachita National Forest.
The prayer for relief in the Supplement to Complaint asks for a declaratory judgment that "the Defendants' supplemental Environmental Impact Statements and Forest Plan amendments and revisions at issue in this action were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of 5 U.S.C. § 706(2)(A)-(F)". (Emphasis supplied). The referenced forest plan amendments and revisions were for the National Forests in Georgia, Alabama, Arkansas, Florida and Louisiana. In addition, Plaintiffs sought a declaration "that the timber harvests and other vegetative management practices identified above constitute actions which are arbitrary, capricious, abuses of discretion, or otherwise in violation of the APA, 5 U.S.C. § 706(2)(A)-(F)". (Emphasis supplied). This was a reference to the Oliver Branch and Wildhorse Creek projects in the Ouachita National Forest. Plaintiffs asserted that "Defendants' denials of the administrative appeals for these projects are also arbitrary, capricious, abuses of discretion, and otherwise not in accordance with law". (Emphasis supplied). The referenced projects were Wildhorse Creek and Oliver Branch.
Plaintiffs further sought: "A setting aside of the SEISs, amendments to LRMPs, and the timber harvests and other vegetative management practices identified above". (Emphasis supplied). This referred at most to the 2000 amendments to the plans for the Ouachita National Forest, the National Forests in Alabama, and the Chattahoochee Oconee National Forest.
Owing to a factual mistake which stemmed from failure to consult the RODs for the VMEISs and SEISs, Plaintiffs did not ask for any of the 2002 forest plan amendments to be set aside. The theory of the Supplement to Complaint was that the 2002 SEISs were intended to shore up NEPA compliance for the 2000 forest plan amendments. Plaintiffs had claimed that the 2000 amendments did not comply with NEPA, in part because the SEISs had not been supplemented before the 2000 amendments were promulgated. However, even if the Supplement to the Complaint is recast to refer the 2002 amendments, it is best construed as applying at most to the forest plans for national forests in Georgia, Alabama, Arkansas, Florida and Louisiana.[17]
Notwithstanding the foregoing analysis, this Court's February 22, 2008 Order vacated the RODs for the SEISs and set aside all of the 2002 forest plan amendments region-wide. As was explained to the parties at a hearing on April 8, 2008, the Court would not have set aside the 2002 forest plan amendments on a regionwide basis but for a fact which had never been mentioned in the parties' briefs. Specifically, each of the 2002 SEISs shared a common, single ROD with all of its respective subregional 2002 forest plan amendments. The same environmental analysis supported both the forest plan amendments and the SEISs. It was not possible to vacate the three subregional RODs, in this Court's view, without setting aside all of the 2002 forest plan amendments. [April 8, 2008 Hr'g Tr. at 160-61].
Plaintiffs want region-wide injunctive relief against all projects authorized under the 2002 amendments. This includes both projects authorized in the past and any projects which may be authorized in the future. Defendants object to region-wide injunctive relief.
Defendants argue that even though the Court found a NEPA violation affecting the 2002 SEISs and 2002 forest plan amendments in Region Eight, Plaintiffs still have the burden of proof under the traditional formulation of elements which must be shown to obtain injunctive relief. Once a plaintiff prevails on the merits, he must show (1) irreparable injury; (2) that monetary damages are inadequate; (3) that the balancing of harms favors plaintiff; and (4) that the public interest would not be disserved by an injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006). Defendants point out that Plaintiffs have produced no evidence at all concerning the attributes of the individual projects they seek to enjoin. All of the evidence in the record comes from the Forest Service representatives who have provided testimony that individual projects should not be delayed for various reasons. Therefore, Defendants argue that Plaintiffs have failed to carry the burden of proof on element (4).
Defendants also urge that Plaintiffs have failed to make any showing that their own interests are implicated in the fate of the projects. Defendants highlight part of the holding in Davis v. Mineta, 302 F.3d 1104, 1115 (10th Cir.2002), which stated, "Plaintiffs must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interest. They have done so here. Plaintiffs' property will be directly impacted by this [highway construction project] and the size and scope of this Project supports a conclusion that the injury is significant." Id. at 1115. Defendants assert that Plaintiffs "have no interest in the timber sale projects which they seek to enjoin. These sales are simply names on a spreadsheet. In almost all instances, no plaintiff even bothered to file administrative appeals to challenge the project when it was proposed by the Forest Service." [Defs.'s Proposed Conclusions of Law, filed July 18, 2008, at 17].
Plaintiffs counter that all four factors are satisfied. Plaintiffs argue that under settled law, a NEPA violation entails irreparable injury, such that an injunction should follow. Plaintiffs cite Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir.2004), and Davis v. Mineta, 302 F.3d 1104, 1114 (10th Cir.2002). Plaintiffs also argue that the Court of Appeals has already found that Plaintiffs would be harmed if their procedural rights under NEPA were violated, citing Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1174 (11th Cir.2006). The Court has already found that Defendants violated NEPA in promulgating the 2002 SEISs and the 2002 forest plan amendments. Plaintiffs argue that an injunction would not be adverse to the public interest, because the public interest is served by the reasoned assessment of environmental issues which NEPA dictates.
In orders entered on January 11 and 14, 2008, the Court directed Defendants to file a statement of the status of each Region Eight project which had been authorized pursuant to the 2002 amendments. On February 1 and 11, 2008, Defendant filed status reports. These reports reflected that 456 projects had been authorized. Some of the projects had been completed; others were partially completed, and others had not yet commenced. The February 22, 2008 Order directed Plaintiffs to identify the projects they wished to have enjoined. Plaintiffs identified 156 of these projects in a filing on March 4, 2008. Defendants filed a response on March 26, 2008 which included affidavits explaining why many of the projects on Plaintiffs' list should not be delayed and explaining that some had been completed (or at least that all timber cutting had been done). The response contained tables which grouped these projects under headings reflecting the purposes Defendants assert that these projects serve, as follows: (1) PETS species' needs (44 projects); (2) promotion of forest health (63 projects); (3) public safety (10 projects); (4) NFMA requirements[18] (23 projects). Plaintiffs filed a reply on April 4, 2008.
An evidentiary hearing was held on April 8 and 9, 2008 at which both sides were invited to present evidence on the issue of remedy. Plaintiffs relied on eight 2006 declarations of representatives of the named plaintiffs which had originally been filed in the Court of Appeals (on the issue of standing). Defendants introduced nine March 2008 declarations of various Forest Supervisors in Region Eight concerning the status of certain projects and an explanation as to why some of the remaining projects are needed to create habitat for PETS species, promote forest health, address public safety concerns, and meet NFMA requirements. Defendants also presented the live testimony of two witnesses, Jerome Thomas and George Bukenhofer. The Court heard oral argument.
Both sides submitted proposed findings of fact and conclusions of law. Plaintiffs filed a revised summary list of projects they wish to have enjoined on May 23, 2008. About 102 projects are on this list. Plaintiffs have explained that in addition to excluding completed projects, they also excluded projects which already have been contracted out to third parties, 42 projects to create habitat for the red cockaded woodpecker, fuel break projects (to create cleared areas which will avert runaway forest fires), trail maintenance projects, prescribed burning (a low intensity burning technique which serves regenerative purposes), hazardous tree removal, a bridge construction project, a road straightening project, projects creating troop training areas for Fort Polk in Louisiana and Camp Shelby in Mississippi, and certain projects designed to protect public health and safety. Plaintiffs did not list any projects in Texas.
Defendants further submitted affidavits of Forest Service supervisors dated on or about July 18, 2008 which state that certain of the projects on Plaintiffs' May 23 revised summary list had been completed (at least, that all timber cutting for the projects had been completed) or were under contract to a third party. Plaintiffs have offered no contradictory evidence. The Court accepts Defendant's position and finds that all timber cutting involved in these projects has been completed or the project is under contract to a third party. For this reason alone, these projects will not be considered for injunctive relief. The excluded projects are:
FLORIDA
Apalachiacola National Forest
Hurricane Salvage Project
Healthy Forest InitiativeWakulla Road (7/5/05)
ARKANSAS
Ouachita National Forest
Black Fork Project
Jack Pigeon Unit 4
Salvage from Wind Storm Project
Trace Creek Project
Compartment 123 Project
Anticipatory Pine Salvage Project
North Waldron Ridge Project
Scottside Ecological Unit 25 Project
Cedar Creek Project
Ozark-St. Francis National Forest
Highway 87 Thinning Project (withdrawn; no longer authorized)
Compartment 4 and 63 Project
Adams Mountain Project
Three Knob Project
First Thinning Project
Middle Fork Project
Barnes Project
Sie Hollow Project
West Morgan Project
Keets Project
Corley Project
Crow Mountain Project
TENNESSEE
Cherokee National Forest
Georges Creek Project
Sylco Ridge Project
MISSISSIPPI
Holly Springs National Forest
Commercial Thinning Compartment 83 Stand 9 Project
Commercial Thinning Compartment 83 Stand 20 Project
Compartment 90 (Stand 8) and Compartment 91 (Stand 14) Project
Homochito National Forest
Analysis Unit 24 Project
Analysis Unit 4 Project
KEPCO 30-413 Oil Well Project
NORTH CAROLINA
Uwharrie National Forest
Big Creek Thinning
Nantahala National Forest
Hazanet Project
Massey Branch Quarry Project
Eagle Fork Project
Second Look Project
VIRGINIA and WEST VIRGINIA
George Washington National Forest
Schoolhouse Road Project (site preparationchain saw and wildlife opening)no remaining timber sale (timber sale complete)
Cubville Project
The remaining projects as to which Plaintiffs seek an injunction are characterized by the following: (1) the projects are not already under contract with a third party and were not completed (that is, all timber cutting had not been done) as of July 18, 2008 and (2) the Forest Service has submitted affidavits of Forest Supervisors which assert that each of these projects serve specific environmental or public safety purposes, such that they should not be delayed. To pick some of Defendants' best examples. Dr. Jerome Thomas, Forest Supervisor for the Francis Marion and the Sumter National Forests in South Carolina testified to the importance of not enjoining the Southern pine beetle and gypsy moth suppression projects in those forests. Defendants argue that Plaintiffs have not made a showing that the public interest would not be disserved by enjoining these projects pending reauthorization. Finally, Defendants observe that Plaintiffs' reasoning in determining which projects to exempt from their injunction requests is inconsistent. Specifically, the 42 projects which would benefit the Red-cockaded Woodpecker involve timber cutting so as to create the open forest glades favored by the Red-cockaded Woodpeckers.[19] Plaintiffs do not want these projects enjoined. on the other hand, Plaintiffs want to enjoin fuel reduction projects (which involve thinning densely planted tree stands) and projects to avert the spread of gypsy moths and pine beetles which also involve cutting timber. The Court does agree that there is tension between the goal of stopping timber cutting and the goal of creating habitat for the Red Cockaded Woodpecker. Probably, the same thing is true for some other protected species as well. However, this reality does not mean that Plaintiffs are entitled to no injunctive relief for projects.
Plaintiffs counter that the deficient NEPA analysis for the 2002 forest plan amendments and the SEISs (as established in the February 22, 2008 Order granting summary judgment to Plaintiffs on Claim II) constitutes irreparable harm entitling them to an injunction against all remaining projects on their revised summary list. These remaining projects are:
FLORIDA
Osceola National Forest
Suwanee Project
Apalachiacola National Forest
Long Term Slash Conversion Project
Health Forest Initiative Project-Wakulla Road (11/4/05)
LOUISIANA
Kisatchie National Forest
Catahoula Forest Health Project Hwy 165 Project
C 104, 107, 112 (2/6/04) Project
C-7 First Thinning Project Winn Forest EA Project
ARKANSAS
Ouachita National Forest
Irons Fork Project
Compartment 12 (Bonnerdale) Project
Lower Lake Winnona Project
Cedar Creek West Project
Avant Watershed Project
Sharp Top Compartment 31 Project
Bonnerdale Compartment 123 Project
Rock Creek Watershed Project
Glover Project
Little Bear Creek Big Creek Project[20]
Huston Project
Lower Brushy Creek Project
Brooks Hollow Project
Ozark-St. Francis National Forests
Green Mountain Project
Advance (9/15/03) Project
Boss Hollow Project
Woodland Ecosystem Project
Elmo Project
TENNESSEE
Flatwoods Habitat Project[21]
SOUTH CAROLINA
Francis Marion National Forest
So. Pine Beetle Suppression Project
Sumter National Forest
Bethesda Project
Woods Ferry Project
Suppression of Pine Beetle on Enoree and Long Cane Ranger Districts Project
Suppression of So. Pine Beetle Andrew Pickens Ranger District Project
MISSISSIPPI[22]
DeSoto National Forest
Shelterwood/Seedtree Project
Delta National Forest
Shanty Lake Analysis Area Project
Holly Springs National Forest
Yalobusha Project
Commercial Thinning Compartment 103 Stand 9 Project
Commercial Thinning Compartment 83 Stand 9 and 23 Project
Commercial Thinning Compartment 103 Stand 10 Project
Commercial Thinning Compartment 73 Stand 8 Project
Chilli Lake
Commercial Thinning (3/28/07) Project
Homochito National Forest
Analysis Unit 5 Project
Analysis Unit 27 Project
1st Thinning 2005 Project
Tombigbee National Forest
Jones Creek Project
Upper Mill Creek Project
Black Prairie Project
Sulfer Springs Project
NORTH CAROLINA
Uwharrie National Forest
Roberto Project
Wildlife Opening Construction Project
Pekin Sale Project
Nantahala National Forest
Stecoah Project
Bear Creek Project
Upper Creek (Chestnut Mountain sale only) Project
Baldwin Gap Project
VIRGINIA and WEST VIRGINIA
George Washington National Forest
Toms Branch Project
McLear Thinning Project
Great Little Timber Sale Project
Grindstone Project
Schoolhouse Road (site prep chainsaw and wildlife opening) (timber sale complete)
Big Run Project
Precommercial Thinning Project (5/10704)

A. INJUNCTIVE RELIEF AS TO PROJECTS AUTHORIZED ATER FEBRUARY 22, 2008:

Plaintiffs' request for an injunction against authorization of future projects under the 2002 forest plan amendments is GRANTED, pending NEPA compliance. This is region-wide relief. Because the 2002 forest plan amendments were set aside effective February 22, 2008, it has not been possible since then and will not be possible in the future for projects to be authorized under the 2002 amendments unless and until an appropriate environmental analysis is done for them. However, that does not mean that projects must be authorized under a 2002 amendment. Some forests have revised plans which postdate and supercede forest plans which contain the 2002 amendments. Other forests have plans which predate the 2002 amendments. The Court means that a 2002 amendment cannot be the authorizing vehicle unless there is NEPA compliance for that amendment.
Similarly, future reliance on the 2002 SEISs (after February 22, 2008) is enjoined, unless there is appropriate NEPA compliance for the SEISs.
In addition, the Forest Service is enjoined from using or relying on the Region Eight Supplement to the Forest Service Manual, unless and until there is proper NEPA compliance or an applicable categorical exclusion. In the absence of the Region Eight Supplement, the Service-Wide version of Forest Service Manual 112672.43 (effective October 1986) [AR 1203 at 4-5] applies. The Court notes this is a "suggested procedure".

B. INJUNCTIVE RELIEF AS TO PROJECTS AUTHORIZED PROR TO FEBRUARY 22, 2008

While Plaintiffs argue that a violation of NEPA leads to a presumption of irreparable harm, there is no presumption entitling plaintiffs to automatic injunctive relief merely because there has been a NEPA violation.[23] The Supreme Court recently specified that, under NEPA, a plaintiff must show that irreparable harm due to the violation is "likely" in order to obtain an injunction. Winter v. Natural Resources Def. Council, ___ U.S. ___, 129 S.Ct. 365, 375-76, 172 L.Ed.2d 249 (2008). In that case, the Navy had prepared an environmental assessment, but not an environmental impact statement, concerning the effects of "mid-frequency active" sonar on marine mammals. Id. at 372-73. The Court reversed the Ninth Circuit's holding that a preliminary injunction may be granted where the plaintiff had only shown the possibility of irreparable injury. Id. at 375-76.[24] The Court found that such a standard was too lenient, and that in the context of a preliminary injunction, a plaintiff must establish that irreparable injury is not just a possibility but is likely. Id. at 375-76. The Court also found that even if there is such a likelihood of irreparable injury to marine mammals, it was outweighed in this case by the much larger interest in national security. Id. at 378.
In the context of other environmental statutes, the Supreme Court has explicitly stated that a statutory violation does not lead to the presumption of irreparable harm such that an injunction must issue; instead, a plaintiff must show that irreparable harm is likely. See Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 544-45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that there is no presumption of irreparable harm where there has been a violation of the Alaska National Interest Lands Conservation Act ("ANICA")); Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (holding that a violation of the Federal Water Pollution Control Act ("FWPCA") does not merit the automatic issuance of an injunction by the district court, but instead the court must balance the equities). In addition, the U.S. Court of Appeals for the Eleventh Circuit affirmed the denial of a preliminary injunction in United States v. Lambert, a case brought under the Clean Water Act, finding that the Government had not made the required showing that irreparable harm would be likely to occur due to the defendant's dumping activities. 695 F.2d 536, 540 (11th Cir.1983). The Court stated that "[e]nvironmental litigation is not exempt from [the] requirement" to show irreparable harm. Id.[25]
Although there appears to be no presumption of irreparable harm in the context of NEPA violations, the Supreme Court has indicated that environmental violations, by their very nature, often lead to irreparable harm. As the Supreme Court stated in Amoco:
[T]he environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. 480 U.S. at 545, 107 S.Ct. 1396. Moreover, in the case of Winter v. Natural Resources Defense Council, the Court emphasized that the harm to marine mammals was being weighed against a very serious interest in national security, and that the current injunction would severely burden the military's ability to conduct appropriate defense training. ___ U.S. ___, 129 S.Ct. 365, 378-82. In addition, the Court found that NEPA's procedural requirements are intended to prevent agencies from making decisions with a lack of information about potential environmental consequences. Id. at 376. The Court observed that the training exercises at issue had been taking place for 40 years and that the most recent series of exercises had only been approved after the issuance of a detailed environmental assessment. Id. at 376.
Plaintiffs' reliance on the SEISs alone as the theoretical underpinning for their claims for project-specific relief is misfocussed. Projects were not authorized under the VMEISs or the SEISs. Rather, they were authorized under forest plans which had the 2002 amendments. It is true that the VMEISs and SEISs played an important part in forming the forest plans, because the decisions reflected in the RODs for the SEISs and VMEISs were incorporated into the forest plans. But setting aside the SEISs does not itself get Plaintiffs to the desired destination, i.e., where projects may be enjoined. To do that, the additional step of setting aside the forest plan amendments is required. Also, to enjoin projects previously authorized under forest plan amendments, the court must know what forest plans and what amendments are involved. A reading of Count VI in the Chattooga Conservancy Complaint which is abundantly fair to Plaintiffs is to limit the scope of potential relief to projects authorized under the 2002 forest plan amendments in the national forests in Georgia, Alabama, Arkansas, Florida and Louisiana. This does not prejudice Defendants, because both sides had an opportunity at the remedy stage to address whether particular projects authorized under the 2002 forest plan amendments should be enjoined. Both sides had an opportunity to introduce evidence and to supplement the record at the remedy stage.
Unlike the cases the parties cite involving a single project, this case involves many projects which were authorized pursuant to forest plans which were amended by amendments (in 2002) which did not comply with NEPA. The Court does not believe that enjoining all previously authorized projects is mandated given a combination of factors which exists. In the first place, reauthorizing these projects under the 1989-1990 forest plan amendments would probably not be outcome-determinative in many cases. With respect to sensitive species, the biological evaluation would still go through similar steps: (1) whether sensitive species exist in the project area and if so; (2) whether the project methods could adversely impact any such sensitive species, and if so; (3) whether any adverse effects of applicable project methods would be contained by the applicable mitigation measures. This process would undoubtedly filter out most project rejections. With respect to proposed, endangered and threatened species the broader, stricter statutory requirements of the Endangered Species Act (16 U.S.C. § 1531, et seq.) would dictate the same outcome regardless of what version of mitigation measure (2) applies. Secondly, as noted, the scope of relief sought in Plaintiffs' Complaint was unclear. Third, it makes sense to limit any injunction to those projects in which Plaintiffs have demonstrated a clear interest. In this case these are the projects for which Plaintiffs filed an administrative appeal. This does not unsettle any legitimate expectations of Plaintiffs. Defendants are right that Plaintiffs have made no showing of an interest in the vast majority of the projects which they now seek to enjoin. The declarations filed on the issue of standing did not address any of these projects. Plaintiffs never expressed any interest in enjoining any previously authorized projects outside Georgia, Florida, Arkansas, Alabama and Louisiana until they were directed to address this subject in an order entered in early 2008.
Accordingly, the Court will limit the potential scope of relief for previously authorized projects to projects in the states of Georgia, Alabama, Arkansas, Florida and Louisiana for which plaintiffs filed administrative appeals.[26]
There are no remaining incomplete projects in Georgia or Alabama which were authorized under the 2002 amendments. In Florida and Louisiana, there are some incomplete projects authorized under the 2002 amendments (three in Florida and five in Louisiana). However, Plaintiffs filed no administrative appeals for any of the Florida or Louisiana projects. Within the state of Arkansas, there are twenty incomplete, not-under-contract projects which were authorized under the 2002 amendments to the Ouachita and Ozark-St. Francis forest plans. Plaintiffs filed administrative appeals for ten of these projects. The Court does not imply that the filing of an administrative appeal would be a prerequisite to this Court's exercise of jurisdiction to enjoin these projects. However, the fact that Plaintiffs filed administrative appeals as to these projects reflects an actual interest in those projects which was expressed before February 22, 2008.
In accordance with the foregoing discussion, the following projects will be considered for injunctive relief:
Ouachita National Forest
Irons Fork Project
Compartment 12 (Bonnerdale) Project
Lower Lake Winona Project
Cedar Creek West Project
Compartment 123 Project
Rock Creek Watershed Project
Big Creek Project
Little Bear Creek Project
Huston Project
Ozark-St. Francis National Forests
Boss Hollow Project
The March 26, 2008 affidavit of Judi Henry, Forest Supervisor for the Ozark-St. Francis National Forests indicates that following Plaintiffs' administrative appeal for the Boss Hollow Project, the Forest Service reversed its decision on this project. [Doc. 370-16 at 6]. Therefore, no injunctive relief is warranted as to this project.
With respect to all of the remaining projects in the Ouachita National Forest, with the exception of the Big Creek Project, declarations of forest supervisors are in the record which describe the purposes of each project. These descriptions, quoted verbatim, are as follows:
(1) The Irons Fork Watershed project was proposed in order to reduce the risk of insect and disease outbreaks, provide a sustained yield of wood products, provide for a diversity of plant and animal communities, and reduce fuel loadings.
(2) The Compartment 12 (Bonnerdale) project was proposed in order to reduce the risk of insect and disease outbreaks, create early successional habitat for species such as quail, and reduce fuel loadings.
(3) The Lower Lake Winona Watershed project was proposed in order to reduce the risk of insect and disease outbreaks, create early seral habitat for species such as quail, reduce fuel loadings, and increase mast production for wildlife food sources.
(4) The Cedar Creek West Watershed project was proposed in order to reduce the risk of insect and disease outbreaks, create early seral habitat for species such as quail, reduce fuel loadings, and increase mast production for wildlife food sources.
(5) The Compartment 123 (Lower Saline River Ecosystem) project was proposed in order to increase early successional habitat for species such as quail, reduce the risk of insect and disease outbreaks, and maintain forest health.
(6) The Rock Creek Watershed project was proposed in order to reduce the risk of insect and disease outbreaks, create early seral habitat for species such as quail, reduce fuel loadings, and increase mast production for wildlife food sources.
(7) The Little Bear Creek Watershed project was proposed in order to reduce the risk of insect and disease outbreaks, create early seral habitat for species such as quail, reduce fuel loadings, and increase mast production for wildlife food sources.
(8) The Huston project was proposed in order to reduce the risk of insect and disease outbreaks, create early seral habitat for species such as quail, reduce fuel loadings, and increase mast production for wildlife food sources.
Having considered the evidence, the Court finds there is an insufficient basis on which to enjoin these eight projects pending NEPA compliance. As explained above, this Court cannot grant an injunction against projects based upon the violation of NEPA procedures alone. Plaintiffs must make a showing of the likelihood of irreparable harm to the environment. Plaintiffs have not shown any specific harm to species that is likely to result from the projects listed above.
Furthermore, Plaintiffs have failed to establish the likelihood of any such harm that might result from the failure to follow NEPA procedures. The harm sought to be prevented by the NEPA procedural requirements is "the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir.1989). The Forest Service authorized these projects under the 2002 forest plan amendments and presumably has performed biological evaluations for the above projects pursuant to the requirements of those amendments. But these biological evaluations, are not in the record, nor have Plaintiffs shown how the biological evaluations already performed would differ from the evaluations that would have been performed under the original 1990 Ouachita Forest Plan. The record does contain relevant excerpts from the Forest Service Manual § 2672.41 ("Objectives of the Biological Evaluation") and § 2672.42 ("Standards for Biological Evaluations"). However, these subsections of the Forest Service Manual have not changed since 1986. [AR 1203, 1204, 1205]. As set forth in the February 22, 2008 Order, the record also contains considerable evidence from Forest Service representatives as to how biological evaluations and field surveys were conducted under the 2002 amendments. They testified in particular to how the biological evaluations were prepared for the Harvey Mill project in Florida [Doc. 620], the Spring Creek project in Louisiana [Doc. 759] and the Eagle Fork[27] project in North Carolina [Doc 1108]. None of this evidence supports Plaintiffs' theory that standards for biological evaluations and field surveys are less rigorous under the 2002 amendments than they were in 1990, such that it is likely that PETS would be harmed by the change. In fact, Defendants' evidence significantly undercuts Plaintiffs' theory.
In summary, the Court is not persuaded that new biological evaluations, conducted under the original standard of mitigation measure (2), would likely provide more information, and therefore more protection to PETS species, than the biological evaluations performed under the 2002 plan amendment. It therefore has not been shown that the harm sought to be protected by NEPA, the harm stemming from uninformed decision-making, is likely to have negatively impacted these specific projects.
Given that Plaintiffs have provided no evidence as to how new biological evaluations would differ from the initial biological evaluations performed when the projects were authorized, or how new biological evaluations would better protect any PETS species in the area, the Court cannot conclude that irreparable harm to PETS or the environment is "likely" to result in the absence of an injunction.[28]
Accordingly, Plaintiffs' request for injunctive relief on projects previously authorized under the 2002 amendments is DENIED.

DECLARATORY RELIEF

A. Meaning of the Original Version of Mitigation Measure (2)

Mitigation measure (2) was intended to serve the purpose of protecting any PETS existing in and around a project site. To that end, mitigation measure (2) required the Forest Service to find out what PETS occupy or are highly likely to occupy a project site, and to determine by preparing a biological evaluation whether the project activities would harm those PETS. Unfortunately, the language chosen by the Forest Service was obscure. Specifically, the meaning of the word "inventory" is obscure. The original version of mitigation measure (2) said in relevant part:
(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the sitespecific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species. Appendix D identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and this chapter are used to prevent them.
This Court found after taking evidence, and now declares, that the term "inventory" in this context means population occurrence data for a species of interest. This may include numerous types of population occurrence data: data from monitoring done pursuant to recovery plans for endangered or threatened species, data reported by the states' Natural Heritage Programs, data reported by environmental or other citizens' groups, data collected from general surveys conducted by the Forest Service or others, and data collected by the Forest Service in project-specific field surveys. In field surveys, Forest Service representatives walk through the property, looking to see if a particular species of interest occupies the area and if so, in what numbers and in what distribution. Various search methods are used for different species. For samples of the methods which are used, see this Court's February 22, 2008 Order, 535 F.Supp.2d at 1292-1293. If no representatives of the species of interest are found, the number "zero" represents the total for the field survey.
Under the original version of mitigation measure (2) the question of whether available population occurrence data is "adequate", or whether instead one or more field surveys must be done is entrusted to the judgment of the Forest Service. This determination, as well as all other findings made in the biological evaluation, is subject to review through an administrative appeal.
The PETS species which are endemic to Region Eight with few exceptions would defy any effort to obtain an accurate headcount within a project area or within a forest. The vast majority of the nonplant species are small and mobile (e.g., spiders, bats, snakes, beetles, salamanders, crayfish, snails, frogs). The idea that the Forest Service could or should produce an accurate count of each such species within a project area, much less within an entire forest does not pass the straight face test.[29] This reality influences this Court's conclusion that "inventory" is population occurrence data, not census data.
Mitigation measure (2) does not require the Forest Service to conduct a project-wide search for all proposed, threatened, and endangered species regardless of whether there is any possibility that the species could exist in the locality, and regardless of whether the project site offers the habitat required by the species at issue. Mitigation measure (1) requires that there be an analysis of site-specific conditions before any project can proceed. Therefore, the Forest Service must have actual knowledge of project site conditions including the available habitat. There is no need to conduct a search for all of the endangered and threatened species which exist nationwide, regionally or forest-wide when only certain species have the potential to exist in the project area. Therefore, in keeping with the express language of the original version of mitigation measure (2), project-specific field surveys may be limited to those PETs species which have a high potential to exist in the project area. To determine whether a particular species has a high potential to occur in a project site, the Forest Service may and should consider the range of the species, the habitat it requires, and the known habitat offered by the site as revealed by the site-specific analysis required by mitigation measure (1).[30]
Sensitive species are designated on a region-wide basis.[31] Region Eight is extremely large and diverse. It includes coastal plain, piedmont, and mountainous areas. Some Region Eight sensitive species would have no potential to occur in some areas of Region Eight. In keeping with the express language of mitigation measure (2), a project-specific field survey may be limited to those sensitive species which have a high potential to occur in the project area.
No statute or regulation requires the Forest Service to maintain forest-wide or project-wide census counts for each proposed, threatened and endangered species. Mitigation measure (2) does not require the Forest Service to maintain forest-wide census counts of proposed, threatened or endangered species.
No statute or regulation requires the Forest Service to obtain forest-wide or project-wide census counts of each sensitive species. Mitigation measure (2) does not require that either.
The original version of mitigation measure (2) requires the Forest Service to obtain adequate project-specific population occurrence data to determine what PETS if any must be included in the biological evaluation. If zero occurrences are found, no PETS need be included in the biological evaluation. While the purpose of this inquiry is to protect PETS, in an instance where a population occurrence is discovered it does provide a small bit of information to the Forest Service. However, this population occurrence data is very unlikely to be useful in projecting forest-wide or region-wide trends for PETS. The Court credits the testimony of George Bukenhofer, Region Eight Program Manager for Threatened, Endangered and Sensitive Species, who estimated that approximately 80% of Region Eight PETS occur in areas which are not actively managed by the Forest Service. [Evidentiary Hr'g Tr. at 150, 199-201, Apr. 8, 2008]. Noting that this figure was just an estimate, but also giving due weight to Mr. Bukenhofer's expertise, the Court FINDS that the vast majority of Region Eight PETS occur in areas which are not actively managed by the Forest Service. Also, the Court credits his testimony and FINDS that PETS species tend to occur in specialized habitats where the Forest Service does not conduct projects. These areas are identified in the forest plans which have been revised since the 1990's. Id. At 199. In addition, the. Court observes that by definition PETS species are rare or somewhat rare; most project-specific counts would be apt to be zero. Also, projects only include a tiny percentage of national forest land at any given time. The Court FINDS that aggregating whatever data might come from the discovery of projectspecific PETS occurrences would not produce census counts and would not provide helpful information in projecting forestwide or region-wide trends. Where a project would destroy representatives of a sensitive species existing in a project area, the Forest Service must demonstrate as Martin requires that the species exists elsewhere[32] in sufficient abundance that the project would not threaten the viability of the species or lead to listed status under the Endangered Species Act. Under Martin and Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1176 (11th Cir.2006) (holding that the Forest Service must keep data on sensitive species), this showing must be made with specific data rather than through conclusory assertions.[33] "Specific data" does not mean total counts of individual representatives of a species in a region or within a forest. It means sufficient quantitative information to justify the Forest Service's conclusion in a particular case. This holding in Martin and Ouachita applies equally to projects approved under the second and third versions of mitigation measure (2). Indeed, it is not a function of interpretation of mitigation measure (2) at all.
Martin and Ouachita envision a projectby-project approach, not a formulation in which no projects in a forest or subregion can be approved unless the Forest Service can display tabular data banks showing census counts for each sensitive species[34] in the forest or region, as well as a census count for sensitive species in the project area. Under Martin and Ouachita, only when it is determined in the biological evaluation that representatives of a sensitive species (1) either exist or are highly likely to exist in the project area and (2) that these representatives would likely be destroyed by the project (notwithstanding any applicable mitigation measures) does the need arise to prove that the viability of the species and its nonlisted status will not be jeopardized.
B. Once the 2002 forest plan amendments are stripped away from the Region Eight Forest Plans which existed in 2002, does the original version of mitigation measure (2) apply to: (a) forest plans last revised prior to 1989, (b) forest plans last revised in the early to mid-1990's, (c) the 1999 revised plans for the National Forests in Florida and The Louisiana (Kisatchie) National Forest, and (d) forest plans revised after 2002?

Plaintiffs' requests for declaratory relief are set forth in Paragraphs 188 and 189 of their Proposed Findings of Fact and Conclusions of Law. Plaintiffs seek a declaration that:
188. ... the Forest Service has reinstated the inventory requirements in the plans existing prior to the VMEISs in those forests which do not have post-SEIS plan revisions. Those are the Nantahala/Pisgah and Uwharrie (North Carolina), the George Washington (Virginia), Mississippi, Louisiana and Florida. 4/8/08 Tr. at 14-16.
189. Similarly, in the other states covered by the SEISs the mitigation measures of the VMEISs should now be in effect, since the SEISs have been vacated. This is regardless of whether there have been post-SEIS plan revisions. Forest-specific documents (e.g. Forest Plan revisions) cannot render moot the regional VMEISs that applied to all vegetation management projects in the region. That is because the actions covered by the VMEISs are a broad array of vegetation management activities, and the Forest Service is still doing all of these activities throughout the region, and therefore the VMEIS mitigation measures apply, regardless of any particular Forest Plan revision for a smaller area within the region.
With respect to the declaratory relief sought in Paragraph 188, it is GRANTED IN PART. It is correct that at the April 8, 2008 hearing, defense counsel stated that the Nantahala/Pisgah, Uwharrie, George Washington, and Mississippi forest plans predate 1989. [Evidentiary Hr'g Tr. at 14-16, Apr. 8, 2008]. As to the George Washington National Forest, that statement is contradicted by the Proposed Findings of Fact and Conclusions of Law filed July 18, 2008, p. 141, which states that the George Washington National Forest is currently managed under the 1993 Revised Land and Resource Management Plan. This is backed up by an affidavit. Accordingly, the Court does find and declare that the Nantahala/Pisgah, Uwharrie and Mississippi National Forests (but not the George Washington National Forest) currently operate under forest plans which predate 1989. These three plans were amended in 1989-1990 with, among other things, the original version of mitigation measure (2). Once the 2002 plan amendment is stripped away the original version of mitigation measure (2) remains in each of these three plans.
Regarding the 1993 Revised Plan for the George Washington National Forests and plan revisions for other forests which were promulgated in the early to mid-1990's, it is noted that these revised plans are not in the record. While it may be inferable that these plans contain the original version of mitigation measure (2), it is not impossible that the wording of mitigation measure (2) in the revised plans could vary somewhat from one plan to another. The Court declines to issue declaratory relief as to whether the original version of mitigation measure (2) is in these plans; Plaintiffs request is dismissed without prejudice.
The Court declines to declare that setting aside the 2002 amendments to the 1999 revised plans for the Louisiana (Kisatchie) and Florida National Forests reinstated the original version of mitigation measure (2). In fact, both of these revised plans (which are in the record) included a revision of mitigation measure (2) which is different from the original version of mitigation measure (2). These revisions are similar, but not identical to the second (2000) version of mitigation measure (2). These revised plans use the term "population occurrence data", not "inventory data". [AR 712 at 2-8; AR 611 at 3-26]. While these plans, including their environmental impact statements and RODs, are in the record, Plaintiffs have presented no argument as to why the environmental analysis for these two revised plans was deficient.[35] In addition, any claim that the 1999 Florida plan is invalid because of noncompliance with NEPA is barred by Plaintiffs' failure to exhaust administrative remedies as to this claim. For these reasons, the Court will not address this part of Plaintiffs' request for declaratory relief and instead dismisses it without prejudice.
With respect to the request for declaratory relief made in Paragraph 189 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law, the Court notes that most of the plans which were revised after 2002 are not in the record. Plaintiffs have made no effort to address the content of any of these plans, including those which are in the record. Plaintiffs have not even identified whether anything similar to mitigation measure (2) is in them. Plaintiffs also have not addressed by reference to the provisions of the plans, their environmental impact statements, and their RODs, whether the environmental analysis was sufficient to support these revised plans. In theory, it does seem that a revised forest plan would not necessarily have to incorporate the features of a separate plan for vegetation management. The Court does not accept Plaintiffs' premise that because a subregional approach to vegetation management was taken from 1989 to 2002, that the Forest Service could not adopt a different approach after 2002. The Court also rejects Plaintiffs' premise that because the VMEISs collectively covered Region Eight, they are of a higher or greater authority than the post-2002 revised forest plans, such that a revised forest plan would be required to incorporate features of the preexisting vegetation management plan. Plaintiffs' argument that because the post-2002 plans allow vegetation management activities, "the VMEISs still apply". This is a specious argument. If the requirements of the VMEISs (the mitigation measures) were incorporated into these revised forest plans the RODs for the revised forest plans would say so.
Furthermore, the Court observes that the Complaints as amended make no NEPA or NFMA claims that the post-2002 revised plans were invalid for any reason. The Court declines to grant declaratory relief based on assumptions about the plans' content and without the benefit of the parties' legal analysis. Further, with respect to all of these post-2002 revised plans, there is no evidence that any administrative appeals were taken. This would be a prerequisite to this Court's jurisdiction to interpret these plans. Plaintiffs want to leapfrog over several essential steps, to embrace a sweeping declaration which might or might not be correct. Accordingly, this request for declaratory relief is dismissed without prejudice.

CONCLUSION
With this Order the Court has ruled on all claims in the two cases which were consolidated to form the instant consolidated case. Some of these claims were previously ruled on in orders entered June 16, 2005 in the Chattooga Conservancy and Forest Conservation cases. In the Chattooga Conservancy case, the Court's Order of June 16, 2005, 373 F.Supp.2d 1353, ruled in Defendants' favor on Counts I, V and VII. In the Forest Conservation case, the Court's Order of June 16, 2005, 374 F.Supp.2d 1187, ruled in Defendants' favor on Counts I, II, the part of Count III asserting an NFMA violation with respect to five projects in the Ouachita National Forest, and Count IV. While Plaintiffs filed general Notices of Appeal in both of these cases which covered all counts, they did not brief the Court's rulings on any of the foregoing claims on appeal. Accordingly, these claims were abandoned and the 2005 rulings on these counts stand.
The remaining counts have been ruled on in the Court's Order of February 22, 2008 and the instant Order in this consolidated case. These remaining claims were denominated as Claims I, II and III. Defendants prevailed on Claims I and III and Plaintiffs prevailed on Claim II. However, for clarity the Clerk will enter judgment by reference to the original count designations in the original cases. Specifically, the Clerk shall enter judgment in the Chattooga Conservancy case in Defendants' favor with respect to Counts I, II, III, IV, V and VII. The Clerk is directed to enter judgment in favor of Plaintiffs on Count VI of the Chattooga Conservancy case. Further, the judgment shall reflect that Defendants are enjoined from authorizing new projects under the 2002 amendments to Region Eight forest plans on and after February 22, 2008 pending NEPA compliance; however, projects authorized under the 2002 forest plan amendments prior to February 22, 2008 are not enjoined.
The Clerk is directed to enter judgment in favor of Defendants on Counts I, II, III and IV of the Forest Conservation case.
The Court having addressed all claims made in these consolidated cases, the Clerk will enter judgment accordingly. Costs are taxed two-thirds to Plaintiffs and one-third to Defendants.

Exhibit A

MANAGEMENT REQUIREMENTS AND MITIGATION MEASURES
This exhibit describes management requirements and mitigation measures required by this Record of Decision. Management requirements set direction on how resources are managed (such as timber stocking standards). Mitigation measures are actions taken to lessen adverse impacts or enhance beneficial effects (such as streamside protection).

GENERAL MANAGEMENT RQUIREMENTS AND MITGATION MEASURES

Site-Specific Analysis
(1) Projects must have site-specific analysis in compliance with the National Environmental Policy Act (NEPA), This environmental analysis considers site-specific techniques, intensity of application methods, and potential environmental effects of any method considered. A reasonable range of alternatives, including one which does not use herbicides and a "no action" alternative, is examined.
Potential direct, indirect, and cumulative effects are evaluated. Effects to be considered include long-term soil productivity, water quality, air quality, visual quality, vegetation diversity, wildlife, fish, cultural resources, civil rights (Including those of minorities and women), and threatened, endangered, proposed, and sensitive species.
(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population Inventory Information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species. Appendix D (Final EIS) identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and chapter II of the Final EIS are used to prevent them. Requirements and measures for actions affecting U.S. Fish and Wildlife Service threatened, endangered, or proposed species are detailed In species recovery plans and FSH 2609.23R. Recovery plans have been prepared for the red-cockaded woodpecker, southern bald eagle, northern bald eagle, gray bat, Indiana bat, eastern cougar, Florida panther, American peregrine falcon, American alligator, and the leopard darter. Chapters in FSH 2609.23R have been prepared for red-cockaded woodpecker, southern bald eagle, and American alligator. Requirements and measures for actions affecting sensitive species are detailed in Forest Land and Resource Management Plans.
If it is determined that the project may positively or negatively affect threatened, endangered, or proposed species, consultation is initiated with the Fish and midlife Service. If, during informal consultation, it is determined that the project is not likely to adversely affect listed species and the Fish and Wildlife Service so concurs in writing, consultation is terminated. However, if it is determined that the project is likely to adversely affect listed species, formal consultation is initiated. Figure D-1 (Final' EIS) outlines this process.
When the evaluation indicates that a project may have an adverse effect on a sensitive species or its habitat, appropriate State wildlife agencies, natural heritage commissions, and other cooperators or species authorities are contacted to identify coordination measures. These measures are directed towards ensuring species viability and preventing negative population trends that would result in Federal listing.
(3) Integrated Pest Management (IPM) principles are used during site-specific analysis. IPM is a decision-making and action process which includes biological, economic, and environmental evaluation of pest-host systems to manage pest populations.
IPM strategies involve a comprehensive systems approach to silvicultural, wildlife, fuel treatment, recreation and corridor management practices that emphasizes prevention of pest problems. These strategies consist of a range of practices that include prescribed fire, manual, mechanical, biological, and chemical tools that may be used alone or in combination. Risk rating systems and pest incidence surveys are used during site-specified analysis. Further IPM direction is provided in FSM 3400, FS'H 3409.11, and Forest Land and Resource Management Plans.
(4) In each project, water quality is protected from nonpoint-source pollution through use of preventive "best management practices" (BMP's). BMP's are developed by States with EPA review to comply with the Clean Water Act and control nonpoint-source pollution. Implementation of BMP's, monitoring and evaluation of their application and effectiveness, and adjustment of practices as needed are done to protect beneficial water uses.
BMP's are applied to all activities. Some BMP's required to protect water quality appear in this section as mitigation measures for soil and water. BMP's applied in projects may be more stringent and more effective in protecting water quality than those in this section, but not less. In each project, site-specific conditions must be assessed, and the BMP's needed to comply with State water quality management plans and pertinent Federal regulations must be employed.
Timber Stand Improvement (TSI)
(5) For evenage timber management, methods that maintain stocking levels (stems per acre) and improve growth rates are used (table II-1).

--------------------------------------------------------------
Table II-1. [*]Southern Region restocking standards:
number of desirable stems per acre.
--------------------------------------------------------------
 Lower[**] Target Upper
Forest Type Level Level Level
Loblolly pine 150 500-700 900
Shortleaf pine 150 500-700 900
Mixed pine-hardwood 150 400-600 900
Hardwoods (all species) 150 250-350 500
--------------------------------------------------------------

(6) Pine stands receive release and weeding necessary to meet growth rates and stocking levels established in Forest Land and Resource Management Plans. Stands are considered for release when the desired seedlings are not free to grow, when competing growth threatens to overtop and compete directly for sunlight, moisture, and nutrients, or when competition results in less-than-average growth for comparable sites.
(7) Precommercial thinning of pine (usually done before age 10 to 15 years) is considered when stem density exceeds the upper level of restocking standards.
(8) Hardwood stands are generally not released. Clumps of competing stems are removed, however, where they may interfere with desired trees.
(9) Hardwood stands, where codominant trees of seedling (not sprout) origin are 25 feet or taller, are considered for precommercial thinning.
(10) Where a mixed pine/hardwood type is the management objective, release or precommercial thinning is designed to favor best quality steins of desired species, which include both hardwood and pine. Best quality includes consideration of origin, form, etc. Desired species are those that best achieve the Forest Land and Resource Management Plan's management objectives.

Soil, Water, and Aquatic Life
(11) Channel stability of perennial and intermittent streams is protected by retaining all woody understory vegetation within at least 5 feet of the bank and by keeping slash accumulations out of the stream. This measure is in addition to filter strips required by items 36 and 53.

Cultural Resources
(12) When any soil disturbing activity is planned, an archaeologist performs a field survey to locate cultural resource sites and assess their significance and protection needs. Sites meeting criteria for significance are nominated to the National Register of Historic Places. All archaeological reports (surveys, site evaluations, site nominations, site protection measures) are submitted to the State Historic Preservation Officer (and/or the Advisory Council on Historic Preservation) for review.
(13) If archaeological or historic resources are encountered during soil disturbing activities, work stops until an archaeologist evaluates the site's significance and the results and recommendations are reviewed by the State Historic Preservation Officer (and/or the Advisory Council on Historic Preservation).

Safety
(14) Safety equipment for Forest Service workers (such as hard hats, eye and ear protection, chaps, and fire retardant clothes) is worn as determined by a Job Hazard Analysis specified in the Health and Safety Code Handbook (FSH 6709.11). This analysis estimates risks to specific body parts and prescribes needed protection.

Visual Quality
(15) Visual Quality Objectives (VQO's) are met by corridor maintenance, site preparation, timber stand and wildlife habitat improvement, range forage, and fuels treatment projects. These VQO's are:

Preservation allows only for change not caused by humans. Generally, no treatments are permitted.

Retention ensures that human activities are not evident to the casual forest visitor. Concern for visual quality is primary. Visual Impacts should be eliminated during or promptly after treatment. Many treatments are allowed, but piling, disking, and broadcast herbicide methods are usually not appropriate.

Partial Retention means that human activities may be evident but remain subordinate to the characteristic landscape. Concern for visual quality is high. Visual Impacts should be eliminated at a minimum within the first year. Most treatments are allowed, but disking and broadcast herbicides are limited. In corridors, all methods and tools are available.

Modification indicates that human activity may dominate the characteristic landscape. Treatments should borrow established line, form, color, and texture so completely that visual characteristics are compatible with natural surroundings. All methods and tools are available for use.

Maximum Modification means that human activity may dominate the landscape, but should appear as a natural occurrence when viewed as background. All methods and tools are used, and at a greater intensity than In modification VQO.
(16) Treatments are scheduled as much as possible for the season that best meets VQO's. Rehabilitation and enhancement work may be needed to meet short-term VQO's. Visual diversity along active travelways (such as canopy layering, flowering trees) is protected from treatments where feasible and needed to meet VQO's. Tool selection and coordination requirements are determined by a sitespecific project analysis.

Wildlife
(17) Wildlife stand Improvement (WSI) seeks to improve vegetation species composition in stands and to develop wildlife habitat areas for game and nongame species. A variety of woody and herbaceous species suited to site conditions and burning regime are maintained to assure year-round quality habitat. Exceptions that may reduce plant species variety include treatments to improve habitat for species such as red-cockaded woodpeckers.
(18) For understory species WSI, proper management allows full sunlight on 30 percent of the forest floor. For hardwood overstory HSI, thinning encourages full crown development, vigorous growth, and soft or hard mast production. When thinning stands older than 30 years, stems are favored which show positive indication of bearing soft or hard mast.
(19) During TSI, WSI, and site preparation, selected groups of overstory and understory vegetation are protected and managed to assure a variety of softmast, hardmast, and cover species. During site preparation, active and potential den trees are retained in clumps (at least 1/2 acre per 20 acres) if they are not provided In adjacent stands not suitable for timber production, inclusions, or streamside management zones. During TSI and HSI, all recognize den trees are protected. In addition, during TSI, HSI, and site preparation, an average of at least 2 standing dead snags are retained per acre, in the form of large hardwood trees (greater than 12 inches) when possible. Appropriate treatments are used to create snags where natural snags are lacking.

Corridors
(20) Each forest works with utility special-use permittees to establish vegetation management objectives (such as wildlife, watershed, recreation, visual quality) for location of new utility lines and maintenance of existing ones. These objectives determine maintenance techniques and strategies.
(21) Where feasible, low-growing shrubs and grasses are established and maintained along utility lines where wildlife and aesthetic objectives are dominant.
(22) Where feasible;, permanent vegetation is established and maintained on the roadbed of intermittent service roads when they are closed, and on the cut and fill slopes of all roads.
(23) Where practical, native flowering species are established, maintained, and enhanced on intermittent service roads when they are closed and on cut and fill slopes of all roads.
(24) Vegetation along trails is treated to maintenance levels Identified in the publication "Trails South." Priority is given to correcting unsafe conditions, preventing resource damage, and providing for intended recreation experience level.

Range Forage
(25) When managing for range forage sites, wildlife and livestock use should not exceed 50 percent of current annual growth of key grass species, 20 percent of total annual; production of key forb species, and 20 percent of current annual growth of key shrub species.
Review and Reporting Requirements
(26) Each national forest must include vegetation management in its management review process. At a minimum, reviews must evaluate adequacy of vegetation management mitigations and monitoring.
(27) Using existing reporting systems, each national forest must report implementation Of its vegetation management program annually. Every 3 to 5 years, Regional Office staff must assess these reports to be sure that the vegetation management program in the Ozark/Ouachita area approximates the acre distribution of methods and tools estimated for the selected alternative.

METHOD-SPECIFIC MANAGEMENT REQUIREMENTS AND MITIGATION MEASURES
These requirements and; measures are in addition to general requirements and measures In the preceding section. Each forest may be more restrictive, but not less.

Prescribed Fire
Site-Specific Planning
(28) A Written site-specific plan for all prescribed burns is prepared by trained resource specialists and approved by the appropriate Forest Service line officer prior to project implementation. This plan includes description of treatment area, burn objectives, weather factors and fuel moisture conditions, and; resource coordination requirements. Coordination requirements include provisions for public and worker safety, burn day notification of appropriate agencies and persons, smoke management to comply with air quality regulations and protect visibility in smokesensitive areas, protection of sensitive features, as well as fireline placement, specific firing patterns, ignition methods, and mop-up and patrol procedures. A post-burn evaluation compares treatment results with plan objectives.

Vegetation Protection
(29) Underburns in loblolly and shortleaf pine stands are not done until pines are 10 to 15 feet tall or 3 to 4 inches in diameter at ground level.
(30) Underburns are not done in commercial pine-hardwood stands and inclusions until hardwood stems reach 5 to 6 inches in diameter at ground level. Only low intensity, dormant season fires with flame lengths of 2 feet or less are allowed.
(31) Underburns are not done In commercial hardwood-pine or hardwood stands and inclusions until hardwood stems reach 8 to 10 inches in diameter at ground level. Only low intensity, dormant season backing fires with flame lengths of 2 feet or less are allowed, Underburns to improve wildlife habitat occur only if habitat is limiting and threatens species viability.
Soil and Water Protection
(32) Slash burns are done so they do not consume all litter and duff and alter structure and color of mineral soil on more than 20 percent of the area. Steps taken to control soil heating include use of backing fires on steep slopes, scattering slash piles, and burning heavy fuel pockets separately.
(33) On severely eroded forest soils, any area with an average litter-duff depth of less than 1/2 inch is not burned.
(34) Growing season underburns are not allowed on the same site more than twice in succession without an intervening dormant season burn.
(35) Where needed to prevent erosion, water diversions are installed on firelines during their construction, and the firelines are revegetated promptly after the burn.
(36) Firelines which expose mineral soil are not located in filter strips along lakes, perennial or intermittent springs and streams, wetlands, or water-source seeps, unless tying into lakes, streams, or wetlands as firebreaks at designated points with minimal soil disturbance. Low-intensity fires with less than 2 foot flame lengths may be allowed to back into the strip along water bodies, as long as they do not kill trees and shrubs that shade the stream. The strip's width in feet is at least 30 plus 1.5 times the percent slope.

Wetland Protection
(37) When wetlands heed to be protected from fire, firelines are used around them only when the Water table is so low that the prescribed fire might otherwise damage wetland vegetation or organic matter. Where practical, previous firelines are reused, and fire-lines must cause minimal soil disturbance.
(38) If a fireline is required next to a wetland, It is not located In the transition zone between upland and wetland vegetation except to tie into a natural firebreak, and it must cause as little soil disturbance as practicable.

Air Quality Protection
(39) Smoke management guidelines based on requirements of the Clean Air Act and State Implementation Plans are used to reduce smoke emissions. When feasible, backing and flanking fires are used instead of heading fires, and burning is done when duff and large fuels are moist and small fuels are dry. Slash piles are not burned unless relatively free of soil. All burns are completed during the active burning period and mopped up as soon as practical after completion.
(40) Smoke management guidelines are also used to enhance smoke dispersion. Burning is done when the atmosphere is thermally neutral to slightly unstable, not during pollution alerts, stagnant or humid weather, or inversions. Burning is done only when:
 air quality or visibility standards in smoke-sensitive areas (see "A Guide for Prescribed Fire in Southern Forests" (Hade and Lunsford 1969) pages 31-32) such as highways, airports, populated areas, and Class I areas will not be violated by smoke from the fire.
 atmospheric mixing height is at least 1,650 feet, transport windspeed is at least 9 mph, and background visibility downwind is at least 5 miles.

Wildlife Protection
(41) Oak-hickory, oak-pine, and oakgum-cypress inclusions are protected by excluding fire or by using lowintensity backing fires.
(42) Generally, underburns are not scheduled during the nesting season to avoid disrupting reproductive activities. Forest managers may, however, use burns to meet specific objectives, such as protecting threatened and endangered species (e.g., red-cockaded woodpecker), reestablishing natural ecosystems, and site preparation. Burns are planned and executed to avoid damage to habitat of any threatened, endangered, proposed, or sensitive species (such as caves used as maternity and hibernating sites by the gray bat and Indiana bat, nests of Bachman's sparrow, and essential habitat of the Caddo Mountain, Fourche Mountain, and Rich Mountain salamanders).
(43) Underburns are planned to achieve their most desirable distribution for plant and animal communities and to break up large, continuous fuel types. When consistent with burning objectives, such burns are done to create a mosaic pattern of fuel types that complements fuel treatment and wildlife objectives.

Safety
(44) Prescribed fires are conducted under the direct supervision of a burning boss with fire behavior expertise consistent with the project's complexity. All workers must meet health, age, physical and training requirements in FSM 5140, and use protective clothing and equipment.

General Resource Protection
(45) Critical values; of the Keetch-Byram Drought Code (Cumulative Severity Index) are developed for all major vegetation-soil-landform types on which prescribed fires are conducted. Burning is allowed only on days when the Drought Code is less than this critical value.

Mechanical Method
Soil and Water Protection
(46) Prompt revegetation is done if treatments leave insufficient ground cover to control erosion by the end of the first growing season.
(47) Only mowing, chopping, shearing, ripping, and scarifying are used on sustained slopes over 15 percent, No mechanical equipment is used on sustained slopes over 35 percent.
(48) Mechanical site preparation is not done on sustained slopes over 20 percent with highly erodible or failureprone soils.
(49) To limit soil compaction, no mechanical equipment is used on plastic soils when the water table is within 12 inches of the surface, or when soil moisture exceeds the plastic limit. Soil moisture exceeds the plastic limit if the soil can be rolled to pencil size without breaking or crumbling.
(50) Mechanical equipment is operated so that furrows and soil indentations are aligned on the contour (with grades of furrows and indentations kept under 5 percent). Do not rip within 30 feet of designated ephemeral drains.
(51) Windrows and piles are spaced no more than 200 feet apart to limit soil exposure, soil compaction, and nutrient loss from piling and raking. Windrows are aligned on the contour.
(52) When piling, at least 80 percent of the area must retain some ground cover of litter and duff, and soil must not be displaced by piling rakes.
(53) Mechanical equipment is not allowed in any defined stream channel except to cross at designated points, and may not expose more than 10 percent mineral soil in filter strips along takes, perennial or intermittent springs and streams, wetlands, or water-source seeps. The strip's width in feet is at least 30 plus 1.5 times the percent slope. Soil and debris are not deposited in lakes, streams, wetlands, springs, or seeps.

Corridors
(54) All trails, roads, ditches, and other improvements in the project area are kept free of togs, slash, and debris. Any road, trail, ditch, or other improvement damaged by operations is promptly repaired.

Safety
(55) Forest Service equipment operators must demonstrate proficiency with the equipment and be licensed to operate it. A helper must direct the operator where safety is compromised by terrain or limited sight distance.

Herbicide Method

Labeling
(56) Herbicides are applied according to labeling information and the site-specific analysis done for projects. This labeling and analysis are used to choose the herbicide, rate, and application method for the site conditions and species to be controlled. They are also used to select measures to protect human and wildlife health, non-target vegetation, water, soil, and threatened, endangered, proposed, and sensitive species.. Site conditions may require stricter constraints than those on the label, but labeling standards are never relaxed.

Choice of Herbicide
(57) Only herbicide formulations (active and Inert Ingredients) and additives registered by EPA and approved by the Forest Service for use on national forests are applied.
(58) Herbicides and application methods are chosen to minimize risk to human and wildlife health and the environment. Non soil-active herbicides will be used in preference to soil-active ones when objectives can be met. Whenever possible and effective, class 4 or 5 mildly hydrotreated mineral oil is used In place of diesel oil in mixtures for application.

Application Rate
(59) Herbicides are applied at the lowest rate effective in meeting project objectives and according to guidelines for protecting human (NRC 1983) and wildlife health (EPA 1986a). Application rate and work time must not exceed typical levels (appendix A, tables 4-4 to 4-6) unless a supplementary risk assessment shows that proposed rates do not increase risk to human or wildlife health or the environment beyond standards discussed In Chapter IV of the Final EIS. Typical application rates (lb/ac) of active ingredient are:

FUEL TRICLOPYR
 FOSAM GLYPH HEXAZ IMAZA OIL LIMON PICLO SULFO Amine Ester
----------------------------------------------------------------------------------------
ML 7.8 1.5 1.7 0.75 2.0 0.9 0.7 0.17 4.0 4.0
MG 1.7
HG 1.7
HF 1.0 0.5 0.75 1.5 0.9 0.4 0.06 1.4 1.0
HB 1.0 0.9 1.9
HS 1.7
HC 1.3 0.75 0.3 1.0
KEY: MLmechanical liquid treatment GLYPHOSglyphosate
 MGmechanical granular treatment HEXAZhexazlnone
 HGmanual (hand) granular treatment PICLOpicloram
 HFmanual foil air broadcast treatment SULFOMETsulfometuron methyl
 HBmanual basal; stem treatment TEBUTtebuthluron
 HSmanual soil-spot treatment /aamine formulation
 HCmanual cut-surface treatment /eester formulation

Application Method
(60) Public safety during such uses as viewing, hiking, berry picking, and fuelwood gathering is a priority concern. Method and timing of application are chosen to achieve project objectives while minimizing effects on non-target vegetation and other environmental elements. Fuelwood sales will not be made in areas where trees have been injected. Selective treatment is preferred over broadcast treatment. Application methods from most to least selective are;
1) Cut surface treatments
2) Basal stem treatments
3) Directed foliar treatments
4) Soil spot (spot around) treatments
5) Soil spot (spot grid) treatments
6) Manual granular treatments
7) Manual/mechanical broadcast treatments

Prescribed Burning of Treated Areas
(61) Areas are not prescribed burned for at least 30 days after herbicide treatment. Firewood sales are not allowed in areas where trees have been injected.

Drift Control
(62) Heather is monitored and the project is suspended `if temperature, humidity, or wind become unfavorable as follows:

 Wind
 Temperatures Humidity (at Target)
 Higher Than Less Than Greater Than
Ground:
 Hand (cut surface) N.A. N.A. N.A.
 Hand (other) 98F 20% 15 mph
 Mechanical (liquid) 95F 30% 10 mph
 Mechanical (granular) N.A. N.A. 10 mph

(63) Nozzles that produce large droplets or streams of herbicide are used. Nozzles that produce fine droplets are used only for hand treatment where distance from nozzle to target does not exceed 8 feet.

Supervision and Training
(64) A certified pesticide applicator supervises each Forest Service application crew and trains crew members in personal safety, proper handling and application of herbicides, and proper disposal of empty containers.
(65) Each Contracting Officer's Representative (COR), who must ensure compliance on contracted herbicide projects. Is a certified pesticide applicator. Contract inspectors are trained In herbicide use, handling, and application.

Protection of Workers
(66) Forest Service workers who handle herbicides must wear a long-sleeved shirt and long pants made of tightly woven cloth that must be cleaned daily. They must wear a hard hat with plastic liner, waterproofed boots and gloves, and other safety clothing and equipment required by labeling. They must bring a change of clothes to the field in case their clothes become contaminated.
(67) Each Forest Service crew must take soap, wash water separate from drinking water, eyewash bottles, and first aid equipment to the field.
(68) Contractors ensure that their workers use proper protective clothing and safety equipment required by labeling for the herbicide and application method. When non-English-speaking crews are used, approximate translation of use and handling of herbicides will be required.
(69) Workers must not walk through areas treated by broadcast foliar methods on the day of application. No foliar application by hand-held tools will be made on vegetation above 6 feet in height.
(70) Supervisors must ensure that monitoring is adequate to prevent adverse health effects. Workers displaying unusual sensitivity to the herbicide in use are medically evaluated and, If tested as sensitive to the herbicide In use, are reassigned to other activities.

Protection of the General Public and Private Land
(71) Notice signs (FSH 7109.11) are clearly posted, with special care taken in areas of anticipated visitor use.
(72) No herbicide is broadcast within 100 feet of private land or 300 feet of a private residence, unless the landowner agrees to closer treatment. Buffers are clearly marked before treatment so applicators can easily see and avoid them.

Protection of Non-Target Vegetation
(73) No soil-active herbicide is applied within 30 feet of the drip line of nontarget vegetation (e.g., den trees, hardwood inclusions, adjacent stands) within or next to the treated area. Side pruning is allowed, but movement of herbicide to the root systems of non-target plants must be avoided. Buffers are clearly marked before treatment so applicators can easily see and avoid them.
Protection of Threatened, Endangered, Proposed, and Sensitive Species
(74) Triclopyr is not applied within 60 feet of known occupied gray or Indiana bat habitat. The same buffers are used with any formulation containing kerosene or diesel oil around habitat of any threatened, endangered, proposed, or sensitive bird during its nesting season. Buffers are clearly marked before treatment so applicators can easily see and avoid them.
(75) No herbicide is ground broadcast within 60 feet of any known threatened, endangered, proposed, or sensitive plant. Selective applications may only be done closer than 60 feet when supported by a site-specific analysis. Buffers are clearly marked before treatment so applicators can easily see and avoid them.

Protection of Water and Soil
(76) Application equipment, empty herbicide containers, clothes worn during treatment, and skin are not cleaned in open water or wells. Mixing and cleaning water must come from a public water supply and be transported In separate labeled containers.
(77) Aquifers and public water sources are identified and protected by consulting with States to ensure compliance with their ground water protection strategies.
(78) No herbicide is applied on rock outcrops or sinkholes in karst areas. No herbicide with a half-life longer than 3 months is applied on slopes over 45 percent, highly erodible soils, or aquifer recharge zones. Such areas are clearly marked before treatment so applicators can easily see and avoid them.
(79) No herbicide is applied within 30 horizontal feet of sinkholes, lakes, wetlands, or perennial or intermittent springs and streams. No herbicide is applied within 100 horizontal feet of any public or domestic water source. Selective treatments (which require added site-specific analysis and use of aquatic-labeled herbicides) may occur within these buffers only to prevent significant environmental damage such as noxious weed infestations. Buffers are clearly marked before treatment so applicators can easily see and avoid them. Picloram may be used only to control kudzu and not in karst topography.

Control of Spills
(80) During transport, herbicides, additives, and application equipment are secured to prevent tipping or excess Jarring and are carried in a part of the vehicle totally isolated from people, food, clothing, and livestock feed.
(81) Only the amount of herbicide needed for the day's use is brought to the site. At day's end, all leftover herbicide is returned to storage.
(82) Herbicide mixing, loading, or cleaning areas in the field are not located within 200 feet of private land, open water or wells, or other sensitive areas.
(83) During use, equipment to store, transport, mix, or apply herbicides is inspected daily for leaks.
(84) Containers are reused only for their designated purpose. Empty herbicide containers are disposed of according to 40 CFR 165.9 Group I & II Containers.

(85) Accident preplanning is done in each site-specific analysis. Emergency spill plans (FSM 2109.12, chapter 30) are prepared. In the unlikely event of a spill, the spill is quickly contained and cleaned up, and appropriate agencies and persons are promptly notified.

Manual Method

Safety
(86) Forest Service chain saw operators must be periodically certified and demonstrate proficiency with chain saws.
(87) Forest Service workers must comply with dress and safety standards specified in the Health and Safety Code Handbook (FSH 6709.11).
NOTES
[1] A substantial number of Plaintiffs' claims were adjudicated in prior Orders entered June 16, 2005 (Chattooga Conservancy v. Jacobs, 373 F.Supp.2d 1353 (N.D.Ga.2005) and Forest Conservation Council v. Jacobs, 374 F.Supp.2d 1187 (N.D.Ga.2005)).
[2] The Ozark/Ouachita, Coastal Plain/Piedmont, and Appalachian Mountains subregions.
[3] The 1989-1990 environmental impact statements also specifically stated they were intended to provide "analytical data that may be used when making site specific decisions in the future". As discussed in this Court's February 22, 2008 Order they did indeed include a substantial amount of data.
[4] Individual projects are authorized in decision notices following the preparation of a biological evaluation and an environmental assessment. For examples of decision notices, see Decision Notice for the Gafford Creek Project [Doc. 76 at 95-99]; Decision Notice for the Kinsey Ecosystem Project [Doc. 73 at 147-159]; Decision Notice for the Middle North Fork of the Ouachita River Watershed Project [Doc. 79 at 137-58]; Decision Notice for the Kingdoodle Ecosystem Management Unit 18 Project [Doc. 82 at 83-99], Decision Notice for the Logan Side Ecosystem Management Project [Doc. 85 at 58-73]; Decision Notice for the Wild Horse Project [AR 913]; and Decision Notice for the Oliver Branch Project [Chattooga Conservancy v. Jacobs, No. 01-CV-1976, Doc. 37 at 399-422].
[5] As stated in the February 22, 2008 Order [Doc. 360 at 13], the ROD for the Ozark-Ouachita VMEIS and the ROD for the Appalachian Mountains VMEIS did not adopt the VMEISs' recommendation that forest plans could not contain a less restrictive version of mitigation measure (2) than the version contained in the VMEIS. The ROD for the Coastal Plain/Piedmont region did adopt it.
[6] The mitigation measures which were adopted in the Ozark-Ouachita subregion are attached to this Order.
[7] Revision is significantly different from amendment in substance and legal effect. Revision may involve an entirely new and different plan.
[8] Until 2005, 36 C.F.R. § 219.9(d) explicitly required that an environmental impact statement be prepared when a forest plan was revised. Until 2001, this requirement was located in the regulations at 36 C.F.R. § 219.10(b), (g).
[9] The Uwharrie, Nantaha/Pisgah, and the Mississippi plans.
[10] These plans are not in the record.
[11] This approach is demonstrated in Plaintiffs' arguments in this case seeking to enjoin specific projects authorized under the 2000 amendments to the Ouachita Forest Plan.
[12] Amendment 4 to the Forest Plan for the National Forests in Texas was exempted. Amendment 4 is the subject of litigation in the Southern District of Texas. The fate of projects in Texas is not before this Court.
[13] "Authorization" in this context means the favorable result of the evaluation made in a decision notice as to whether the project is consistent with the forest plan and complies with applicable law.
[14] The categorical exclusion did not fit because the Supplement to the Manual was for Region Eight only, not "Service wide" as required by the categorical exclusion in question.
[15] The VMEIS for the Appalachian subregion does not address the activity of range forage improvement, as the VMEISs for the Coastal Plain / Piedmont subregion and the Ozark/Ouachita Mountains do. However, the VMEIS for the Appalachian subregion does address two additional major activities not addressed in the VMEISs for the Coastal Plain / Piedmont Region or the Ozark / Ouachita Mountains: 1) "Recreation site maintenance, which improves user safety and enjoyment at developed recreation sites," and 2) "Mountaintop bald management; which preserves or enhances these unique features of the Appalachian Mountains." [AR 104 at I-2].
[16] The Court credits the sincerity of Dr. Thomas' testimony, but notes that he is a Forest Supervisor for the Francis Marion and Sumter National Forests. The Court does not assume that he could speak authoritatively outside his own jurisdiction on this subject. Further, it is noted that the Multiple Use-Sustained Yield Act of 1960, 16 U.S.C. § 528, requires the Forest Service to manage the national forests for timber production as well as for other uses. Even though the Forest Service apparently has abandoned its timber quota system in favor of setting non-binding "goals" for timber harvests, it seems that there would still be pressure on Forest Service officials to identify projects that would involve timber harvests.
[17] The lack of clarity in the Chattooga Conservancy complaint has been a major source of difficulty in this case. For one thing, it has made it very difficult to determine what needs to be in the record.
[18] "NFMA requirements" refers to the NFMA requirement that restorative/regenerative measures must be employed following a timber harvest. 16 U.S.C. § 1604(g)(3)(E); 36 C.F.R. § 219.12.
[19] The U.S. Fish and Wildlife Service's Redcockaded Woodpecker (Picoides borealis) Recovery Plan (2nd edition, 2003) [Defs.'s Ex. 5, Evidentiary Hr'g, Apr. 8-9, 2008] states in its Executive Summary, p. x:

Red-Cockaded Woodpeckers require open pine woodlands and savannahs with large old pines for nesting and roosting habitat (clusters). Large old pines are required as cavity trees because the cavities are excavated completely within inactive heartwood, so that the cavity interior remains free from resin that can entrap birds.... Cavity trees must be in open stands with little or no hardwood midstory and few or no overstory hardwoods. Hardwood encroachment resulting from fire suppression is a well known cause of cluster abandonment. Red-Cockaded Woodpeckers also require abundant foraging habitat. Suitable foraging habitat consists of mature pine with an open canopy, low densities of small pines, little or no hardwood or pine midstory, few or no overstory hardwoods, and abundant native bunch grass and forb groundcovers.... Fire suppression has resulted in loss of potential breeding groups throughout the range of Red-Cockaded Woodpeckers, because the birds cannot tolerate the hardwood encroachment that results from lack of fire. This limitation is stressed through the use of prescribed burning.
[20] No affidavit has been submitted regarding the purposes which would be served by the Big Creek Project.
[21] Defendants object to enjoining the Flatwoods Habitat Project because the issue whether it was properly authorized was adjudicated in the United States District Court for the Eastern District of Tennessee in Cherokee Forest Voices v. United States Forest Service, Case No. 2:04-cv-316. Cherokee Forest Voices asserted that the Flatwoods Habitat Project did not comply with the requirements of NFMA and NEPA. The District Court rejected Plaintiffs' arguments; the U.S. Court of Appeals for the Sixth Circuit held that there had been adequate NEPA compliance but that the NFMA analysis by the district court had been erroneous. On remand, the parties reached a settlement. The case was dismissed with prejudice.

Plaintiffs argue that res judicata does not apply because Cherokee Forest Voices is not a party in this case. They acknowledge that Douglas A. Ruley represented Cherokee Forest Voices in the Tennessee case. In the instant case, Mr. Ruley along with other attorneys represents the Chattooga Conservancy, Biodiversity Legal Foundation, Florida Biodiversity Project, Georgia Forest Watch, Wild Alabama, and Wilderness Society. There is an affiliation between Cherokee Forest Voices and some of the Plaintiffs in this case. Apparently, these organizations all use the services of Mr. Ruley to handle litigation for them. More importantly, the web page for Cherokee Forest Voices at www.cherokee forestvoices.org states that Cherokee Forest Voices is a coalition of individual members and certain organizations, including Sierra Club, Wilderness Society and Wild South. All three of these organizations are Plaintiffs in this case. The Sixth Circuit's opinion referred to Cherokee Forest Voices as "a collection of environmental groups." [Defs.' Ex. 21 at 1, Evidentiary Hr'g, Apr. 8, 2008]. Res judicata is a doctrine which binds "parties and their privies." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). It applies not only to arguments which were made, but also to arguments which could have been made. Id.; In re: Atlanta Retail, Inc., 456 F.3d 1277, 1284-85 (11th Cir.2006). It does appear that Sierra Club, Wilderness Society and Wild-South are "privies" of Cherokee Forest Voices. Accordingly, the Court will accept Defendants' res judicata argument as to the Flatwoods Habitat Project.
[22] The Court rejects Defendants' argument that no projects in Mississippi, Virginia and West Virginia can be enjoined on account of a January 23, 2004 order dismissing without prejudice claims involving 26 projects in those states. That order pertained to specific projects authorized under the 2000 amendments which were identified by name in the Forest Conservation complaint. Those 26 projects are not on Plaintiffs' Revised Summary list. The 2004 order has no preclusive effect on claims affecting projects authorized in Mississippi, Virginia and West Virginia which were authorized under the 2002 amendments.
[23] One of the cases cited by Plaintiffs, Wilderness Watch v. Mainella, held that a complete failure by the Park Service to consider the environmental impact of its decision to use motor vehicles in the wilderness was not a "technical violation" of NEPA and therefore could not be excused as harmless error. 375 F.3d 1085, 1096 (11th Cir.2004). It did not hold that there is a presumption of irreparable harm when granting an injunction based on a NEPA violation.
[24] While the injunction at issue in that case was a preliminary injunction, the Court noted that its analysis would apply equally to the granting of a permanent injunction, the only difference being that actual success on the merits, rather than a likelihood of success, must be shown in the context of a permanent injunction. Id. at 380-82.
[25] Other circuits have applied Amoco and Weinberger to situations involving violations of NEPA and have explicitly found that a violation of NEPA does not give rise to a presumption of irreparable harm. See Northern Cheyenne Tribe v. Norton, 503 F.3d 836, 844 (9th Cir.2007) (noting that the Court in Amoco held that there is no presumption of irreparable harm in the case of a NEPA violation); Town of Huntington v. Marsh, 884 F.2d 648, 653 (2d Cir.1989) ("[A] threat of irreparable injury must be proved, not assumed, and may not be postulated eo ipso on the basis of procedural violations of NEPA"); but see Davis v. Mineta, 302 F.3d 1104, 1114-15 (10th Cir.2002) (holding that "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure" but also holding that plaintiffs must show irreparable injury "to their specific environmental interests").
[26] Of the 156 projects listed in Plaintiffs' March 4, 2008 filing, relatively few administrative appeals were filed outside Arkansas. The relationship between projects and appeals in each state was as follows: Florida 8/0, Georgia 0/0, Louisiana 25/0, Arkansas 44/19, South Carolina 9/2, Tennessee 3/0, Mississippi 38/2, North Carolina 21/4, Virginia 11/5. Because the decision notices for all of these projects were issued between 2002 and January 1, 2008, it is too late for any further administrative appeals to be filed.
[27] Contrary to Plaintiffs' assertion in their proposed findings of fact, Mr. Bukenhofer did not say that sensitive species potentially existing in the Eagle Fork project area would be adversely impacted by the project. He said an individual representative "could be" impacted if for example one was hit by a falling tree, inadvertently stepped on, or run over by mechanical equipment. Evidentiary Hr'g Tr. at 241-243, April 9, 2008.
[28] The Forest Service has provided its rationales for conducting these projects and how they will likely benefit the environment. The Court notes that the benefits described by the Forest Service's declarations are modest. "Reduction of fuel loadings" might in a given case be a compelling rationale, but the level of detail offered in the declarations does not make a compelling case. However, this does not play a part in the Court's decision because Plaintiffs have not met their initial burden of establishing a link between the violation and harm to PETS or the environment. Even if it did play a part, the outcome would be the same.
[29] Plaintiffs have been coy and inconsistent in explaining their contention as to the meaning of "inventory." In response to this Court's 2005 request that they provide their interpretation, they responded first that "the methodology of the inventory is not at issue", but then offered that it meant "the quantity of goods or inventory on hand". Chattooga Conservancy, 373 F.Supp.2d 1353, 1373 (N.D.Ga. 2005). At a hearing in 2007 Plaintiffs' counsel stated that counts of species would not be required in all cases, but that counts should be required in the case of a species "such as an eagle". [Hr'g Tr. at 9, Oct. 12, 2007].
[30] It is important to note that the Endangered Species Act, 16 U.S.C. § 1531 et seq., imposes broad and stringent requirements on federal agencies in relation to protection of endangered and threatened species and their habitats. See especially 16 U.S.C. § 1536(a)(2), § 1538(a)(1)(B). To facilitate compliance with § 1536(a)(2), the agency must prepare a "biological assessment" for any proposed, threatened or endangered species which "may be in the area of such proposed action." 15 U.S.C. § 1536(c). (Emphasis added). The Forest Service cannot limit its biological evaluation to those listed species which are found in the project area or those which have "high potential" to exist there. It must make informed judgments concerning the proposed, endangered and threatened species which "may be present". The Forest Service does in fact abide by these more restrictive requirements in preparing biological evaluations for PET species.
[31] Apparently the Forest Service also maintains forest-wide lists.
[32] "Elsewhere" does not necessarily mean just within the same national forest.
[33] Martin and Ouachita are binding authority in the Eleventh Circuit (Georgia, Alabama and Florida).
[34] Upon further consideration this Court does believe that the holdings of Martin and Ouachita are directed only to sensitive species, not proposed, endangered or threatened species.
[35] At an earlier point in this litigation Plaintiffs cited a statement in the VMEISs that forests could not adopt a version of mitigation measures (1)-(4) which was "less restrictive" than that in the VMEISs. They argued that this precluded forest plan amendments and forest plan revisions adopting "less restrictive" measures. Only the Coastal Plain/Piedmont VMEIS's ROD adopted this requirement. The Ozark/Ouachita and the Appalachian RODs did not adopt it. The National Forests in Florida and the Louisiana (Kisatchie) National Forests are in the Coastal Plain/Piedmont subregion. However, this Court concludes that the intent of the ROD for the 1989-1990 Coastal Plan/Piedmont ROD was to bind those forest plans which existed at that time, not to bind future revised plans, which require a fullblown new, independent environmental analysis. This conclusion is in part a function of construing the Forest Service's intent as reflected in the simultaneously prepared 1989-1990 documents. The 1989-1990 VMEIS and the respective forest plan amendments were packaged together. It is also a function of the fact that under NFMA the forest plan is the central document.
[*] Stocking levels shown are guides, and must be used in conjunction with professional judgment to determine restocking levels for a specific site.
[**] Based on site index 50. See the Ozark-St. Francis and Ouachita Plans for Lower Level guides on sites where site index is greater than 50.